**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

In re:

Samuel J. Nappi,

                   Debtor

Chapter 13
Case No. 16-20071

## MEMORANDUM OF DECISION

The debtor's chapter 13 plan proposes an allowed secured claim of $28,400 for Bangor

Savings Bank.  Asserting that its collateral is worth more, the bank opposes confirmation.  The

bank, as the sole objecting party, contends that the plan does not comply with 11 U.S.C. §

1325(a)(1) or 11 U.S.C. § 1325(a)(5).  The bank's objection is overruled and the plan will be

confirmed.

### I.    BACKGROUND

On March 17, 2017, the Court held a trial on the bank's objection, during which

evidence—in the form of testimony and exhibits—was admitted.  The parties also stipulated to

certain facts, *see* Stipulation of Undisputed Facts [Dkt. No. 76], and that stipulation is part of the

record in this contested matter.  *See* Fed. R. Bankr. P. 3015(f); *see also* Fed. R. Bankr. P. 9014.

Based on that stipulation and the evidence admitted at trial, the Court makes the following

findings of fact.  *See* Fed. R. Bankr. P. 7052; Fed. R. Civ. P. 52(a).

Before this case was commenced, the debtor owned or controlled a limited liability

company known as CCXXXIII, LLC.  In 2014, the LLC bought a restaurant in Yarmouth,

Maine, and sought financing for the acquisition from the bank.  As part of the loan application,

the debtor prepared and submitted to the bank a list assigning a total value of $65,145 to all of

the restaurant equipment to be acquired in the purchase.  When the debtor valued the equipment

at $65,145 for purposes of the loan, he did so by looking at all of the equipment in the restaurant for about fifteen minutes, taking pictures, and looking at used restaurant equipment for sale online.  On July 31, 2014, just before the loan closed, the debtor sent an email to the bank, reiterating that he had "determined the value of the equipment to be $65,145.  That figure includes all equipment and furnishings in the restaurant and is a conservative figure.  Not included in that figure are office furnishings and equipment and signage.  The breakdown you are looking for is $M&E/F&F $80,625 . . . ."

When the bank approved the loan application, it issued a commitment letter agreeing to lend $75,000 to the LLC, subject to numerous conditions including a requirement that the LLC maintain both business personal property insurance in an amount satisfactory to the bank and a key man life insurance policy on the debtor's life in an amount of at least $75,000.

On August 18, 2014, the LLC executed and delivered to the bank (a) two promissory notes with an aggregate original principal balance of $90,000, and (b) two commercial security agreements granting the bank security interests in all inventory, equipment, accounts, and general intangibles.  That same date, the debtor delivered to the bank two commercial guarantees in which he individually guaranteed all of the LLC's indebtedness to the bank.

After the LLC purchased the restaurant, the debtor learned that the prior owner had leased certain items of equipment on the premises, and that he had not acquired title to those items in the sale.  Some of the equipment broke and was not replaced; other equipment became obsolete when the restaurant changed its name.  The remaining equipment suffered from ordinary wear-and-tear over time.

Before he filed for chapter 13 in February 2016, the debtor caused the LLC to transfer all of its assets to him in exchange for his assumption all of the LLC's liabilities.  He continued to

own and operate the restaurant, and he later proposed to fund the plan with the cash flow from the restaurant.  In his Schedule A/B, the debtor assigned a value of $15,000 to his restaurant equipment and supplies.  He determined this value after a rushed effort.

In August 2016, the key man life insurance policy on the debtor's life lapsed, and was not thereafter renewed.  From February 2016 until at least March 2017, the debtor maintained an insurance policy on his business personal property in the amount of $84,411.  His insurance agent determined the amount of this policy after communicating with the bank and inspecting the restaurant's front of the house.

The bank timely filed two proofs of claim in the debtor's case.  In Proof of Claim No. 13, the bank asserted a claim of $62,382.57 secured by the debtor's business assets, which it valued at $80,265.  And in Proof of Claim No. 14, the bank asserted a claim of $14,546.05 secured by those same business assets.  The debtor did not object to these proofs of claim, or move for a determination of the bank's secured status under Fed. R. Bankr. P. 3012.

However, in November 2016, the debtor filed the plan.  The plan includes a request for a determination that the property securing the bank's claims was valued at $28,400, an amount based on assumption that the bank's claims were secured by both its interest in his restaurant equipment and by a $13,400 lien on the debtor's residence.  At trial, the debtor acknowledged that the bank did not, in fact, have a lien on his residence.  But he did not propose an amendment to the plan's treatment of the bank's claims.  The plan proposes to allow the bank a secured claim of $28,400, to be paid with five percent interest over the course of the plan's 56-month term, and to treat the remaining portion of the bank's claims as unsecured.

## II.   DISCUSSION

As the party opposing confirmation, the bank bears the initial burden of producing some evidence in support of its objection.  *See* In re Bradley, 2017 WL 562427, at *3 (Bankr. D. Me. Feb. 10, 2017).  The debtor, as proponent of the plan, bears the ultimate burden of demonstrating that all confirmation requirements are satisfied.  Id.  The issue raised by the bank's objection is whether the plan's treatment of the bank's allowed secured claim satisfies section 1325(a)(5).[1]

There are three avenues for a plan to satisfy section 1325(a)(5) with respect to an allowed secured claim.  In re Flynn, 402 B.R. 437, 442 (B.A.P. 1st Cir. 2009).  The first is acceptance of the plan by the holder of the allowed secured claim under section 1325(a)(5)(A).  The second is the surrender of the collateral to the holder of the allowed secured claim under section 1325(a)(5)(C).  In this case, the bank has not accepted the plan and the debtor has not surrendered the collateral.  So, with respect to the bank's allowed secured claim, the debtor must satisfy each of the requirements of the last remaining avenue, section 1325(a)(5)(B).  Only one of those requirements is at issue in this case:  the requirement that the value of the property to be distributed under the plan on account of the bank's allowed secured claim is not less than the allowed amount of such claim.  11 U.S.C. § 1325(a)(5)(B)(ii).[2]  Satisfaction of this requirement hinges upon a determination of the allowed amount of the bank's secured claim.

The bank's claims, proofs of which were timely filed, are deemed allowed in the absence of objections.  *See* 11 U.S.C. § 502(a).  The bank's proofs of claim also constitute prima facie

---

[1]  The bank asserts that the plan undervalues its collateral and fails to properly provide for its allowed secured claim in contravention of the requirements of both 11 U.S.C. § 1325(a)(1) and 11 U.S.C. § 1325(a)(5).  But the bank need not look to the catch-all provision of section 1325(a)(1) to make this argument, as section 1325(a)(5) specifically addresses permissible plan provisions for allowed secured claims and the allowed amount of such claims.  Because the analysis under section 1325(a)(5) is dispositive, this decision will not separately analyze the bank's objection under section 1325(a)(1).

[2]  The bank has not argued that the plan fails to satisfy the requirements of sections 1325(a)(5)(B)(i) or 1325(a)(5)(B)(iii).

evidence of the validity and amount of the bank's claims.  *See* Fed. R. Bankr. P. 3002(f).

However, the allowance of the claims under section 502 is not determinative of the bank's

secured status, and neither the Code nor the Rules provide "any evidentiary effect whatsoever to

a secured creditor's asserted value of collateral."  In re Hudson, 260 B.R. 421, 431 (Bankr. W.D.

Mich. 2001).  Determining secured status and the value of collateral is instead a function of 11

U.S.C. § 506.  *See* Tamir v. U.S. Trustee, 2016 WL 8674475, at \*4 & n.6 (D. Me. Jan. 22, 2016).

And under section 506(a), an allowed claim secured by property of the estate is bifurcated into

two parts – a secured claim to the extent of the value of the property securing the claim and an

unsecured claim to the extent the allowed claim exceeds the value of the property securing the

claim.  The extent of the bank's claims that are secured for the purposes of section 1325(a)(5)(B)

thus depends upon the value of the restaurant equipment that serves as the collateral; to the

extent that the amount of those claims exceeds the value of the collateral, the claims are

unsecured.  *See* 11 U.S.C. § 506(a)(1).

The Code has long instructed that any valuation of the property securing a claim must be

"determined in light of the purpose of the valuation and of the proposed disposition or use of

such property, and in conjunction with any hearing on . . . a plan" affecting the interests of a

secured creditor.  Id.  Aside from that instruction, and before BAPCPA, the Code was silent on

the valuation methodology to be employed.  *See* In re Henry, 457 B.R. 402, 406 (Bankr. E.D. Pa.

2011).  However, in 1997, the Supreme Court held that when a chapter 13 debtor proposes to

retain personal property for use in the debtor's trade or business, and to treat a claim secured by

that property under section 1325(a)(5)(B), the valuation must be based on the "replacement

value" of the property.   Assocs. Comm. Corp. v. Rash, 520 U.S. 953, 960 (1997).  The Court

defined replacement value as the price that "a willing buyer in the debtor's trade, business, or

situation would pay a willing seller to obtain property of like age and condition." Id. The Court

further explained that "the 'proposed disposition or use' of the collateral is of paramount

importance to the valuation question," id. at 962, and that "the replacement-value standard

accurately gauges the debtor's use of the property," id. at 963.

When BAPCPA was enacted in 2005, Congress codified Rash's replacement value

methodology for non-consumer personal property in cases under chapter 7 and 13. In re Henry,

457 B.R. at 407. It also added a new definition of replacement value for the valuation of

consumer personal property in such cases. Id. Section 506(a)(2) now provides that:

> If the debtor is an individual in a case under chapter 7 or 13, such value with
> respect to personal property securing an allowed claim shall be determined based
> on the replacement value of such property as of the date of the filing of the
> petition without deduction for costs of sale or marketing. With respect to property
> acquired for personal, family, or household purposes, replacement value shall
> mean the price a retail merchant would charge for property of that kind
> considering the age and condition of the property at the time value is determined.

11 U.S.C. § 506(a)(2).

In this chapter 13 case, where the debtor's non-consumer personal property secures the

bank's claims, value must be determined based on the "replacement value" of the collateral "as

of the date of the filing of the petition." Id. The Court, as fact-finder, is tasked with identifying

"the best way of ascertaining replacement value on the basis of the evidence presented." Rash,

520 U.S. at 965 n.6.

In this case, the bank's collateral includes the equipment in the debtor's restaurant. This

equipment includes the items that one might expect to find in the front and the back of the house

in the restaurant industry: ovens, stoves, coolers, silverware, dishware, tables, chairs, etc.

Although the bank adduced sufficient evidence of value to meet its initial burden, the

bank did not offer persuasive evidence of the value of the collateral as of the petition date in

February 2016.  The bank's valuation evidence consisted of the debtor's list of equipment generated in 2014 to obtain the loan; the debtor's 2014 email to the bank reiterating his determination that the equipment was worth $65,145; and proof that the debtor had, from February 2016 to at least March 2017, maintained insurance on the contents of the restaurant in the amount of $84,411.  Both the 2014 list and the 2014 email suffer from numerous deficiencies, the most obvious of which is the passage of time.  Almost nineteen months passed between the creation of the 2014 list and the 2014 e-mail, on the one hand, and the petition date on the other.  The debtor also credibly testified that the collateral did not include all of the items originally believed to be part of the acquired assets, that some items became obsolete or broken, and that some items had lost value as a result of wear and tear.

With the evidentiary value of the 2014 list and the 2014 email so discounted, the bank can rely only upon the face amount of the debtor's business insurance policy.  The face amount of that policy is not, by itself, enough to substantiate the bank's argument that its collateral is worth more than $65,000.  Insurance policy coverage may very well constitute evidence of value in a determination under section 506(a).  *See* 4 COLLIER ON BANKRUPTCY ¶ 506.03[9] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2009).  But, in this case, the debtor testified that his insurance agent set the face amount of his policy after corresponding with the bank and inspecting the restaurant's front of the house.  This testimony substantially undermines the evidentiary significance of the insurance policy.

That said, the debtor did not offer compelling evidence of collateral value as of the petition date either.  At trial, the debtor submitted Exhibit D-A, a list valuing each item of equipment in the restaurant.  The list was not dated and he did not explain when the valuations were conducted.  It appears that the total value of the equipment included in Exhibit D-A is

- 7 -

$10,585.  The debtor explained that the values included in Exhibit D-A yielded a lower sum than

the $15,000 figure set forth on his Schedule A/B because he had reached the $15,000 figure in a

rush.  However, Exhibit D-A unrealistically asserts that some of the restaurant's assets have no

value at all.  Though some of the restaurant's assets may have minimal value, they must have

some.  These no-value valuations cast doubt on the reliability of the entirety of Exhibit D-A.

For the purposes of section 506(a), the collateral is not worth $15,000 or less as the

debtor contends, and it is not worth more than $65,000 as the bank's argument implies.  The

debtor assigned a value of $28,400 to the bank's secured claim in the plan in error.  Although he

has acknowledged the error, he has not moved to amend that provision of the plan.  This $28,400

figure is closer to the replacement value of the collateral than either of the parties' positions.

The debtor asserted that the restaurant equipment included in the purchase was valued at

around $65,000 when he bought the restaurant in 2014, and he submitted a list to the bank to

substantiate that total.[3]  When he generated that list, he did so by comparing the used equipment

in the restaurant with used restaurant equipment for sale online.  If that total figure of $65,000 is

reduced by the items that were excluded from the sale, reduced by the items that have broken or

become obsolete, and further reduced by wear and tear to the remaining items over time, those

remaining items could reasonably be valued somewhere in the neighborhood of $28,400.

Valuation necessarily involves estimates and a certain degree of imprecision; in many cases, it is

more of an art than a science.  Here, where the parties have painted with broad strokes and failed

---

[3]  The Court has reservations regarding the accuracy of the 2014 valuation of roughly $65,000.  But based on the
evidence presented in this matter, and given both parties' reliance on that 2014 figure, it is a logical starting place.

to present persuasive evidence supporting their arguments, the Court finds and concludes that the

replacement value of the bank's collateral is $28,400.[4]

The bank's objection to confirmation of the plan is overruled.  A separate order

confirming the plan will enter.


Dated:  April 26, 2017                    _____

                                          Michael A. Fagone
                                          United States Bankruptcy Judge
                                          District of Maine

---

[4] As to the key man life insurance, there is no dispute that the policy has lapsed and has not been replaced.  As such, the policy is not part of the collateral for the bank's allowed secured claim and does not contribute to the amount of the allowed secured claim.  The plan does not attempt to cure any defaults under the loan documents, *see* 11 U.S.C. § 1322(b)(3), and the bank has not raised any other objections relating to what could be fairly characterized as a loss or dissipation of a specific item of collateral.  The bank also cites no authority to support its contention that "the Debtor's failure to provide key man life insurance constitutes a continuing Event of Default preventing conformation [sic] of the Amended Plan."  Objection of Bangor Savings Bank [Dkt. No. 63, at ¶ 17]. A debtor's inability or refusal to comply with a covenant in a pre-petition loan agreement does not, by itself, compel denial of confirmation of a chapter 13 plan.  *Cf.* In re Seatco, Inc., 259 B.R. 279, 289 (Bankr. N.D. Tex. 2001) ("[V]irtually every debtor is in default of its prepetition loan agreements with it secured lender when it files bankruptcy.").